May it please the Court, Mr. Gilmour, my name is Kent Morrow from Bismarck, North Dakota. I represent the appellant Robert Fool Bear, Sr. He's filed an appeal of four convictions involving sexual acts on the Standing Rock Reservation. I'd like to concentrate my appeal and argument on two of the convictions. One is for attempted aggravated sexual abuse of a child. Essentially our position is there's four essential elements that the jury was instructed to follow. One, essential element three and four, they were stipulated by the parties to apply to this case as well as all of the accounts. Where Mr. Fool Bear takes issue with the finding of the jury and believes that no reasonable jury could find beyond a reasonable doubt that he met all the essential elements in count one was from the fact that the way the government charged this, they charged specifically penetration however slight of the vulva of VFB by a penis. Government in its closing argument on page 314 essentially indicated this is count one and it says the defendant knowingly engaged in or attempted to engage in a sexual act with VFB, that is penetration however slight of the vulva of VFB by penis. Well you didn't hear that did you? That didn't come out on the stand. So in essence they chose their particular charging of the indictment strictly limited to penetration of the vagina by the penis of Mr. Fool Bear. They conceded that they did not present any evidence to support that conviction. You're talking about the attempt right now, right? The attempt. Well, but the problem I'm having with that is I'm not suggesting it's consensual, but the best way to, obviously, but the best way to describe what happened was some sort of mutual fondling that happened during the course of the lead up to that. And when you have a situation where you have mutual fondling, I mean, can't you say that that's a substantial step towards intercourse? Am I wrong about that? Maybe I'm reading too much into it. At least a jury could infer that intercourse is to follow. Well, essentially the problem with that analysis is, with all due respect, is the fact that nothing, the factual scenario did not bear that out. I'm sorry, did not what? Bear that out. It simply did not end. It ended. The victim walked away and went back to her bedroom. There was no attempt to keep her there. There was no, the government believes that a similar completed act about two months later constitutes an inference by a jury that they can find that there was an intent or an attempt to complete the sexual act. Well, and that's relevant too, right? So not only do you have sort of the mutual masturbation going on, but you also have the fact that you had similar incidents months later that the jury heard where it did end up in intercourse. And certainly isn't that relevant, again, for the jury to infer that the actions that took place on that earlier date were a substantial step towards what eventually happened later? Well, I think if you limit it, I would like to limit it to the facts on that particular incident. There was no attempt by Mr. Fulbear to complete a sexual act through penetration of the vagina. He simply . . . What do you make of the government's statement? I guess it was a closing argument. It's not uncommon for victims and witnesses to testify short of expectations. What were they talking about? Well, I was not the trial counsel, so I'm not certain what the government was referring there. As compared to earlier disclosures. In other words, they seem to be saying that she didn't say as much as they expected her to say with respect to this. That may have been the case, but that's the government's obligation is to elicit that type of testimony. I understand. They did not. I'm trying to ask you what your view of that statement is. I think it's trying to save a conviction that . . . I'm sorry, I can't hear you. I think it was trying to save a conviction that they did not present sufficient evidence to establish. And the second argument was on count three, the aggravated assault, sexual abuse . . . I guess that was actually in the government's brief rather than at trial. But in any event, it's a statement by the government. Right, correct. I'd like to go on to whether there was sufficient evidence to sustain a conviction for aggravated sexual abuse of a child by force. That required that the defendant knowingly caused BFP to engage in a sexual act, did so by the use of force. The jury was instructed that there are four particular separate definitions of force. One is the use or threatened use of a weapon. That was not argued by the government. That was not presented any . . . there was no testimony presented of any threatened use of a weapon. Second one is the use of physical force sufficient to overcome, restrain, or injure a person. In this particular factual situation, Mr. Fullbear did nothing to prevent her from leaving, did nothing to hold her down. He did nothing to restrain her by engaging in an act. He simply took her, laid her on the bed, proceeded to engage in a sexual act. But not by force. But he pulled her, correct? He . . . Grabbed her? That was the government's leading statement. Did he grab you by the shoulders? Yes. And laid her on the bed. And so if the testimony is that he grabbed her, wasn't there also testimony that he had been physically assaultive toward this girl in the past? I believe that came out later. That was in October of 2015. So there was no evidence of physical . . . physically assaultive behavior toward her prior to this particular count? No. From my reading of the transcript, there was none. It was a separate incident later on for which he was acquitted of, ironically, use of a shod foot to commit assault with a dangerous weapon. The third force definition is the use of a threat of harm sufficient to coerce or compel submission by the victim. I submit there was no threat of harm stated by Mr. Fullbear. He did indicate, let's keep this between ourselves. Let's not tell anybody. I don't believe that that constitutes a threat of harm. He never threatened to harm her if she let . . . stated what had happened. Fourth definition of force is force sufficient to prevent a victim from escaping. There again, factually, he did not prevent her from leaving. She left and went to her bedroom. That ended the incident. So our position is that no reasonable jury could find that he used any force. There was no sufficient evidence beyond a reasonable doubt that any force was used to coerce her into compelling . . . Where do those four categories come from? They're not in the statute anywhere, and I'm trying to figure out where they're from. Because it seems like these are all sort of extra things that have glossed on, maybe in the case law or something, that have nothing to do with the statute. And maybe . . . I mean, we're still bound by it, but I'm just trying to figure out where all this is from. I was not to trial counsel, but I believe it was from the . . . I could be wrong. The Eighth Circuit standard jury instruction on the use of force. Did they charge . . . I guess a follow-up question is did they charge A2? And I'll ask the . . . I'll ask the . . . which is the next statute. A lot of this seems to arise under A1. But A2 is the more natural fit for this, which is by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping. Was that charged at all? Do you know? I don't believe it was. So, it was an A1 case? A1 case, yes. Okay. The government conceded in its final argument that there's not a lot of force here. Didn't grab her, didn't chain her down, didn't handcuff her to the bed, did not use anything other than grab her by the shoulders, take her into the bedroom, and later on the bedroom, or on the bed, and committed a sexual assault. What do you say, just to follow up a little bit, is we have a case called United States v. Gabe, a 2001 case. I don't know if you're familiar with it or not. I am. But it's a case where the victim testified that Gabe forced her to have sexual intercourse without consent. And it had very, very similar facts. And applying those four categories in an opinion by Judge Loken, we said, well, that's enough. That's enough. And it had sort of the similar pulling that Judge Kelly referred to earlier. And I guess, what do we do with that? And if you're not familiar with the case, it's probably unfair to ask you. Well, if I can engage in conjecture as to what that case stood for, I don't think it fit. The definition by the victim is that he gently laid me on the bed. It seems to imply that no force was used to overcome her, I hate to say resistance, because there was no resistance. There was no resistance on her part. It was a factual question, but I believe that there was no reasonable jury could find, based on the conceded factual elements in this case, that there was any force used to compel this victim into engaging in a sexual act. I don't believe there's any question that he engaged in a sexual act, but he did not compel her to engage in that sexual act by the use of force or threaten use of force in any way. I've saved two minutes for rebuttal. Unless the Court has any further questions, I will see that time. Thank you. Thank you. Mr. DeLorme. May it please the Court, Counsel. Again, my name is Gary DeLorme. I'm the Assistant United States Attorney in Bismarck, North Dakota. I was trial counsel for this particular matter. One of the things I want to start with, Judge Ostrowski, is I did cite Gabe in my brief, because of the similarities to this particular fact pattern, and what the jury would have heard throughout this trial, and all of it's relevant when they're considering it, either as 413 evidence, if it was in charge, it could have been brought in as 413 evidence. What they heard throughout trial is that this girl was assaulted the first time. Count one originated when she was approximately ten years of age. Two months later, the first penile vaginal penetration occurred. Thereafter, she testified it happened on a periodic basis, once or twice a week, or every couple of weeks, to the extent that she agreed that 96 times, roughly in that time period that she was with this individual, she would have been sexually assaulted. They also heard about prior violent physical assaults involving this individual in the defendant. They also heard that she'd run away multiple times throughout this period of time. Were those physical assaults before the first attempted sexual abuse? In other words, that the jury could... Not before the first attempted sexual abuse when she was ten, but it would have been before she had the abuse by force when she was 17. And that's where it kind of comes into a little bit more relevance, because we're talking about force here, and we talk about the definition of force. In particular here, we're probably looking at sub two and three of the definition in the model instructions, which is the use of physical force sufficient to overcome a person. When you take an individual and you look at that individual, and that's what the jury would have done, they would have taken this girl, VRB, they would have looked at her and they would have said, well, God, you know, 96 times over this period of time, she'd been physically abused throughout this period of time. She's 17 now, and the defendant comes in, grabs her by the shoulders, directs her to the bedroom, pushes her. She says it wasn't a hard push, onto the bed, pulls her to the side of the bed that he wants to sexually assault her on, removes her shirt, leaves her bra on, removes her pants and panties, and then sexually assaults her. The physically assaultive conduct, what was the testimony about that that would have predated this assault that may have informed the jury about her view of his grabbing her? I think there was some testimony that after her brother committed suicide, she was physically assaulted to the point where she was unable to walk very well. When you say she was physically assaulted by the defendant in this case? Correct. And then there was a count four that was charged in this matter, which was a rated assault for basically a shot foot. He kicked her multiple times in a bedroom with steel-toed boots or shoes that he was wearing at the time. Now, the jury did not find that, particularly because during that assault, she had produced a box cutter knife that she had in her bedroom that she attempted to use to protect herself. But because of the way the altercation was portrayed before the jury, they determined that they weren't going to convict the defendant of that particular matter. But that would have been occurrences that occurred before the assault when she was 17. How does the VRB's mental state play into the use-of-force analysis? Use-of-force seems to be about, well, the use of force. But it seems like the government relied a lot on things that are not unrelated. They're not unrelated, but things that are disconnected in time that may have informed her mental state. So what's the government's view on how the mental state analysis plays into use-of-force? Your Honor, in cases like this, I don't know how a jury could not read that into the assessment. I mean, you take an individual, and from the age of 10 to 17, they've been sexually assaulted, physically assaulted. They've gotten to the point that when somebody comes in who's bigger than them, stronger than them, grabs them by the shoulders, you've got a choice to make there. You run away, you get returned back to the home. That's the way the system was working. She got returned multiple times when she tried to run away. Once he grabs her by the shoulders, the choice is, do I get sexually assaulted, or do I go ahead and put up a fight, get physically assaulted, and then sexually assaulted? And the reason why I asked the disconnected by time question, had the physical assaults ever happened contemporaneously, close to in time, any of the sexual assaults? And maybe that doesn't make a difference. I'm just curious factually whether there was some sort of connection that she would have made immediately between refusing to submit and undergoing a beating. I don't think that was ever portrayed that way in testimony. I think what a jury probably would have inferred, though, is that any of the assaultive behavior came in time when there was runaways. And, of course, if you extrapolate from that, this individual is running away from something. So she's running away from the sexual assaults, but then she gets returned and then physically assaulted. That's what the jury would have been left with in the deliberation when they talked about that. The other question I asked the opposing counsel, and this is more of a backup and foundational question, this was an A1 case, right? You charged it under A1, and then we've got the four glosses on A1. You didn't charge this under A2, did you? No, Your Honor. Okay. And you agree with me this is a gloss that I think our cases have placed on the statute, those four categories, those four ways of proving an A1 violation? Rigged, yes. The definition is in 2246. Yes, Your Honor. Okay. Let me ask you, please, about the attempt at count one. What did you mean in your brief when you said sometimes witnesses fall short of expectations? Well, Your Honor, when you take a case and you've got an 18-year-old, and I believe she turned 18 just a day or two prior or a couple days prior to this trial, you're taking her out of a small community. What are we supposed to make of that? Apparently you're saying she didn't testify to the full extent of what she disclosed. I'm sorry? She didn't testify to the full extent of what she disclosed previously. So how is that relevant? It's not other than to indicate to the court that there is, if these cases come up, that. We're supposed to infer from that that actually it was worse than, I mean, that has nothing to do with what's in the record, right? Correct. And that's not going to be something that you'd likely probably take into consideration. We have to decide this case based on what's in the record. Right, Your Honor. Okay. I wonder, how is this case different from United States against Plenty Arrows? Well, Your Honor, I guess I'd have to refresh my memory on Plenty Arrows. I know that was cited in both my brief and I think the defense as well. I think that was the case involving the defendant placing his penis on the victim's buttocks. I think that that was, if I'm not mistaken, the Plenty Arrows case. The difference here, again, when you look back at the questions that Judge Strauss asked Mr. Morrow, is you have to take everything into account here. Two months later, he's physically, sexually assaulted her with penile-vaginal penetration. Here, he stopped short that one day, the very first time he stopped short. We don't know exactly why he stopped short. But he did get to the point of putting her hand on his bare penis, and he put his bare hand on her vagina. And had that been charged as a sub-two for the contact, there would have been a proven case. It wouldn't even have been an attempt. She tested it. It was not so charged. It was not so charged under two, Your Honor. But whatever stopped him from proceeding further that day, the jury could have looked at these 96 other times that the assault that took place two months later and said, you know what, we think, we believe that he intended to take this. This was a substantial step towards penetration. He stopped for some reason, whatever reason it was. Well, I guess it really comes down to whether we think that inference is sufficiently strong to carry the day in a reasonable mind that this offense was committed beyond a reasonable doubt. Right. And that would have been a reasonable inference to make, Your Honor, because the victim testified that she was homesick that day, and her uncle's girlfriend left to go pick up food at a location about 20 miles away. I think it would have been a better case if these events, these later events had actually occurred before, maybe. But that doesn't mean this isn't a sufficient inference by itself. I'm not saying it's not necessarily, but it's not a particularly strong case in my mind. It's not, but you've got to look at the overall circumstance of the case and the results of the jury's deliberations. They took a look at the case. They took a look at the instructions. We have to assume that they applied all of the instructions. In fact, they found the defendant not guilty of column four, which was the aggravated assault. So they would have looked at the instructions that outline in detail what a substantial step was and what they needed to find in that particular aspect in finding him guilty of column one. Right. They did so in this particular matter, Your Honor. As far as the remainder of my presentation, I just briefly want to talk about issue five that was presented. I guess from the perspective of state law definitions, I don't know, I guess, the relevance of that here. But I know the court properly instructed the jury as to the definitions that were outlined in 2246 for these particular matters. I would, unless there are any further questions, I would ask the court to deliberate and affirm the convictions of this particular matter. Thank you. Thank you, Your Honor. I guess I'll travel back this far and indicate I have no rebuttal argument. Unless the court has any questions, I don't want to have any rebuttal. Thank you. Thank you, and we thank the parties for their briefing and their argument, and the case is now submitted. Are we now?